**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

INNERWORKINGS, INC.,

     Plaintiff,

v.                          CASE NO. 8:21-CV-00903-SDM-AEP

SARA HORN AND SMART
SOURCE, LLC.,

     Defendants.

_____/

## <u>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW</u>

Defendants, Sara Horn and Smart Source, LLC, ("Horn," "Smart Source" and collectively "Defendants"), by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. 56, hereby move for summary judgment in their favor and against Innerworkings, Inc. ("IW") on all claims asserted in the Amended Complaint. DE 76. As grounds, Defendants state:

## <u>INTRODUCTION</u>

IW's claims are a house of cards ready to collapse because IW made a global strategic decision to pursue a wholly inapplicable damage theory that is not supported by the law cited below, the facts, or the evidence.   In short, IW asserts a variety of claims based on allegations that Defendants destroyed its business by improperly hiring IW employees and interfering with IW customers. IW contends that "***February 14, 2020*** [is] the date that Innerworkings Hawaii sales ***representatives and customers***

1

*departed for Smart Source*, and the destruction of its Hawaii business was complete." DE 141 at 10-11 (emphasis in original).

IW contends that "if a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the of the loss." *See* DE 145 at 10 n.5 (citing *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 Fed. Appx. 591, 601 (11th Cir. 2006)). Accordingly, for each of its claims, IW requests that the Court award IW the fair market value of its operations that were located in Hawaii as of February 14, 2020.

Thus, the threshold issue this Court must, respectfully, resolve, before even considering the merits of the underlying claims, is whether IW's "total destruction" damage model is applicable to the facts of this case, and if so, whether February 14, 2020 is the date of the alleged loss. IW does not have any other damage evidence, so if the Court rejects IW's damage model, or its proposed date, the Court should enter summary judgment against IW on all claims. *See, e.g., A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333 (S.D. Fla. Mar. 26, 2021) (granting summary judgment where plaintiff failed to present evidence of recoverable damages for the claims pled).

The Court must reject the "total destruction" damage model because IW's business simply was not destroyed as claimed. IW was a global public company that ultimately sold to a third party several months after February 14, 2020. IW never considered or treated its business in Hawaii as a separate entity, and there is no authority to support IW's imaginative argument that the Court can award "total

destruction" damages because IW's "global" business was allegedly impacted in a single state.

Equally problematic for IW, the evidence is undisputed that IW retained customers and employees after February 14, 2020, so even assuming its "total destruction" theory was viable (it is not), evidence of damages as of February 14, 2020 are wholly irrelevant and insufficient to withstand summary judgment. IW impermissibly seeks a "windfall" by obtaining the total value of **all** its assets as of February 14, 2020, despite the fact that it continued to generate revenue from some of those same assets after February 14, 2020, and ultimately sold its entire business, including that revenue stream a few months later. That is quintessential double-dipping.

On the merits, IW's claims are also subject to summary judgment because IW has no evidence to support them. For example, IW brought four (4) breach of contract claims against Horn, yet IW has no witness who can authenticate or introduce an admissible copy of the alleged contract.  Similarly, IW does not have any evidence that the alleged contractual breaches, or any of the other allegedly tortious conduct, caused IW's alleged damages.

IW's entire case is premised on alleged facts which IW contends prove and evidence a coordinated scheme by Defendants to target IW, and IW then assumes that Defendants' alleged conduct was the cause of IW's damages. To be sure, IW did not even depose any of its former clients to ascertain why they elected to cease doing business with IW.  IW therefore cannot prove that any of Defendants' alleged conduct

proximately caused harm to IW. Smart Source, on the other hand, has testimony in this record from former IW's customers that Smart Source ***did not*** contact them to stop working with IW and that they decided on their own to cease doing business as a result of unrelated issues with IW. *See* Declaration of Michael Skedeleski, attached as **Ex. 1**; Declaration of Dino Corpuz, attached as **Ex. 2**; Declaration of Jocelyn Apo, attached as **Ex. 3;** Declaration of Mike Nakato, attached as **Ex. 38**. The Court should not permit IW to survive summary judgment and proceed to trial with no actual evidence to support their allegations and assumptions, especially where those assumptions are directly refuted by the record evidence. *See*, *e.g.*, *Westgate Resorts, Ltd. v. Sussman*, 2019 WL 3848805 (M.D. Fla. July 26, 2019) (precluding plaintiff from going to trial on tortious interference claims where plaintiff failed to adduce evidence as to why the specific contracts were breached).

IW also asks the Court to assume that because Horn had access to some unidentified information, which IW contends are trade secrets, Horn must have used that information in a manner that damaged IW.  Again, IW has no evidence to substantiate its assumptions.

For these and other reasons set forth in greater detail below, the Court should grant summary judgment in favor of Defendants and against IW on all claims asserted in the Amended Complaint.

## STATEMENT OF UNDISPUTED FACTS

**The Parties and The Industry**

1.  At all times relevant to its claims, IW was a Delaware Corporation with its principal place of business in Chicago, Illinois and described its business as "a leading ***global*** marketing supply-chain company that provides marketing and promotional materials for some of the world's most marketing-intensive companies." DE 76, at ¶¶ 22, 25 (emphasis added).

2.  IW typically generated business in one of two ways: (1) by procuring products for its customers on an order-by-order basis, known as the "middle market" or "transactional" business; or (2) by procuring products for its customers on a fixed contract basis, known as the business process outsourcing "BPO" or "enterprise" business. *See* Deposition of Sara Horn ("Horn Depo."), dated October 14, 2022, at 17:17-18:16, 23:3-20, attached as **Ex. 4**; *see also* Deposition of Mike Wagner ("Wagner 30(b)(6) Depo."), dated January 12, 2023, at 36:20-25, attached as **Ex. 5**.

3.  IW did not have contractual relationships with its middle market business customers; rather, customers would place orders via purchase order and there was no guarantee that any middle market customer would direct their future business needs to IW.  Horn Depo., at 18:8-25, Ex. 4.

4.  IW's 30(b)(6) Corporate Representative Mike Wagner conceded that IW's middle market customers could do business with IW or any other another competitor in the industry or even simultaneously do business with multiple competitors. Wagner 30(b)(6) Depo., at 71:21-72:25, Ex. 5.

5. Smart Source is also a marketing supply-chain company that provides marketing and promotional materials to its customers. DE 76, at ¶ 57.

6. Smart Source and IW operated within the same print and promotional products industry and both operated in Hawaii. Deposition of Thomas D'Agostino, Jr. ("D'Agostino Depo."), dated December 12, 2022, at 128:9-22, attached as **Ex. 6;** DE 76, at ¶¶ 58, 98, 116.

**Horn's Employment with IW**

7. Horn began working at IW in 2009. Horn Depo., at 16:2-7, Ex. 4.

8. Horn resides in Florida and worked from IW's Florida office location. *See id.* at 102:22-103:14, 36:19-38:2.

9. Horn performed a variety of job functions during her tenure at IW. *Id.* at 16:17-20. During the last nine years of her employment, Horn held the title of Vice President of Operations. *Id.* at 16:21-17:3. As Vice President of Operations, Horn's job duties consisted of supporting the company, inventory management, e-store management, billing, and generally managing all of the company's back-office operations. *Id.* at 23:7-12.

10. During the majority of her time in the role of Vice President of Operations, Horn did not work directly with any of the middle market sales representatives based in Hawaii. *See id.* at 23:21-24:5. Horn's operations role was focused on IW's "BPO" or "enterprise" contract clients rather than IW's "middle market" or "transactional" order-by-order clients. *Id.*

11.     During the last six months of her employment, IW transitioned Horn's day-to-day role into managing IW's middle market business at the direction and oversight of Mike Wagner. *Id.* at 17:6-14.

12.     Horn's passion was in operations, not sales, and Horn was not interested in working in a sales focused position long-term. *Id.* at 63:18-24.

**IW Does Not Have Any Admissible Evidence That Horn Signed Any Restrictive Agreements With IW**

13.     ████████████████████████████████████████████████ ███████████████████████ (the "2018 Stock Agreements"). INWK 001170-71, attached as **Ex. 7**.[1]

14.     ████████████████████████████████████████████. 30(b)(6) Deposition of Ronald Provenzano ("Provenzano 30(b)(6) Depo."), dated December 16, 2022, at 141:3-9, attached as **Ex. 8**.

15.     IW did not manage or store copies of the 2018 Stock Agreements, which were administered through UBS Financial Services, Inc. ("UBS"). Deposition of Janell Oudenhoven ("Oudenhoven Depo."), dated October 19, 2022, at 115:24-118:2, attached as **Ex. 9**.

16.     Biana Markovsky ("Markovsky") testified in both her individual capacity as well as in her capacity as a UBS' designated corporate representative.  In her UBS corporate representative capacity, Markovsky testified that UBS no longer maintains

---

[1] Defendants are redacting portions of the Motion which refer to materials that IW has designated "confidential," pursuant to DE 37 and DE 38, and filing such material under seal pursuant to LR 1.11(d).

or has access to copies of the 2018 Stock Agreements and further that UBS does not have copies or evidence of what Horn saw at the time she allegedly accepted the 2018 Stock Agreements or the tracking details relating to Horn's UBS account. 30(b)(6) Deposition of Biana Markovsky ("Markovsky 30(b)(6) Depo."), dated January 11, 2023, at 34:11 – 37:24, 90:3-12, 136:13-18, 146:10-15, 151:11-15, 157:18-20, attached as **Composite Ex. 10**.  In her individual capacity, Markovsky confirmed that UBS does not have record of the 2018 Stock Agreements. Deposition of Biana Markovsky ("Markovsky Individual Depo."), dated January 11, 2023, at 45:22 – 46:11.

17.    UBS no longer has the tracking or related details either. *Id.* at 151:11-15.

**Horn's Employment with Smart Source**

18.    In early 2019, Smart Source was looking to hire a Chief Operating Officer ("COO") and used a recruiter to search for potential candidates.  Deposition of Jack Huber ("Huber Depo."), dated October 20, 2022, at 104:16-105:10, attached as **Ex. 11**.

19.    Horn was identified as a potential candidate because she had the experience Smart Source was looking for, having worked in multiple facets within the industry. *Id.* at 109:13-22.

20.    Smart Source ultimately hired Horn as its COO in August of 2019. Horn Depo., at 45:5-10, 264:16-18, Ex. 4.

21.    The COO position was a promotion for Horn, as she had previously been managing only a segment of IW's business. *See id.* at 17:4-8. Now, Horn would be in charge of operations for an entire company. *Id.* at 264:16-265:1.

22.     During the interview process, Smart Source requested that if Horn had any agreements with IW, Smart Source would like to see them. Huber Depo., at 109:23-110:4, Ex. 11.

23.     Horn informed Smart Source that she was not aware of what, if any, agreements she had with IW but that she would reach out to IW's HR to inquire. *Id.* at 111:15-19. Smart Source believed that Horn reached out to IW on multiple occasions and never received anything in return. *Id.* at 112:12-15.

24.      Smart Source had no knowledge that Horn had alleged agreements with IW that included post-employment restrictive covenants. *See id.* at 115:23-116:17. Smart Source has still never received nor seen a verifiable, signed employment-related agreement pertaining to Horn. *See id*. at 115:20-116:4.

**IW's Declining Business**

25.     ███████████████████████████████████████████████████

███████████████████████████████. *See* Deposition of Charles Hodgkins ("Hodgkins Depo."), dated November 30, 2022, at 103:3-104:14, attached as **Ex. 12**; *see also* Provenzano 30(b)(6) Depo., at 189:16-190:4, Ex. 8.

26.     Specifically, IW's entire middle market business was declining in the years 2018, 2019, and 2020. Wagner 30(b)(6) Depo., at 162:17-22, Ex. 5. ███████

███████████████████████████████████████. 30(b)(6) Deposition of Colin Henry ("Henry 30(b)(6) Depo.), dated January 13, 2023, at 117:14-21, attached as **Ex. 13**; INWK 013946, attached as **Ex. 14**.

27.     IW was interested in selling, or at least willing to sell, its entire middle market business to the extent there were any interested or willing buyers.  Wagner 30(b)(6) Depo., at 258:1-23, Ex. 5

28.     The middle market sales representatives, as well as other IW's employees, were well aware of this fact. Horn Depo., at 26:10-27:15, 61:6-62:2, Ex. 4.

**Termination And Departure Of IW's Employees Located In Hawaii**

29.     . INWK 013947, attached as **Ex. 15**; *see* also INWK 001440 (

), attached as **Ex. 16**; INWK 000772 (

), attached as **Ex. 17**.

30.     . INWK 013947, Ex. 15.

31.     . *Id.*

32.     . Wagner 30(b)(6) Depo., at 199:7- 11, Ex. 5; INWK 003360, attached as **Ex. 18**; INWK 003255, attached as **Ex. 19**.

33.     . INWK 013947, Ex. 15.

34. █████████████████████████████████████████████████████

████████████████████████. *Id.*

35. █████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████. *Id.*; INWK 013946, Ex. 14.

36. ████████████████████████████████████████. INWK 004040-

41, attached as **Ex. 20**. However, Clayton ultimately resigned from IW because service

at the corporate level was lacking. Deposition of Clayton Ichikawa ("Ichikawa

Depo."), dated December 7, 2022, at 116:17-20, attached as **Ex. 21**.

37. █████████████████████████████████████████████████████

████████████████████. INWK 000772, attached as **Ex. 22**.

38. Mandy Villa, a former production manager for IW did not join Smart

Source. Deposition of William "Bill" Thomas ("Thomas Depo."), dated August 23,

2022, at 82:3-4, attached as **Ex. 23**.

39. Smart Source was unaware that IW's Hawaii-based sales employees had

any alleged restrictive agreements. Huber Depo., at 236:16-237:25, Ex. 11.

40. The only agreement Smart Source received prior to hiring such

employees was an incomplete and unexecuted version of an alleged agreement. *Id.*

**IW Has No Evidence That Employees Located in Hawaii Left IW Due to
Defendants' Alleged Conduct as Opposed to Other Factors**

41. █████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████. INWK 004403, attached as **Ex. 25**; *see* Wagner 30(b)(6) Depo., at 189:2-7, Ex. 5. IW further anticipated unplanned attrition as a result of the new compensation plan. Wagner 30(b)(6) Depo., at 180:10-181:1, Ex. 5.

42.    Bill Thomas testified that IW's relationships with its sales representatives had been on a steady decline for a number of years—the company was slow, not supportive of the Hawaii-based sales representatives, and overall hindered Hawaii-based sales representatives' ability to secure repeat business. Thomas Depo. at 81:16-24; 77:4-78:23, Ex. 23.

43.    Sheri Hamaguchi also expressed her dissatisfaction with IW to her coworker, Lori Iwata, upon learning of Iwata's departure. INWK 000661 ("████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████"), attached as **Ex. 26**.

44.    Generally, IW's middle market sales representatives did not feel supported by the company. Horn Depo., at 25:18-26:19, Ex. 4.

**The Hawaii Project**

45.    ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████. Wagner 30(b)(6) Depo., at 59:24-60:5, Ex. 5; INWK 013946, Ex. 14.

46. ███████████████████████████████████████████

█████████████████████████████████████████████████

████████. INWK 001728-30, attached as **Ex. 27**.

47.    IW designated three (3) employees to handle the "Hawaii Project": Patrick Bane, Erik Gershfeld, and John Bageris. Wagner 30(b)(6) Depo., at 59:24-60:5, Ex. 5.

48.    These "Hawaii Project" employees reported their efforts to Mike Wagner.  *Id.* at 60:6-15.

49.    The "Hawaii Project" was successful in retaining a number of its Hawaii-based customers. *See id.* at 22:22-24:1.

50. ███████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████. INWK 004055, attached as **Ex. 28**.

51. ███████████████████████████████████████████

████████████████████████████████. *See* INWK 004707, attached as **Ex. 29**.

52.    Nonetheless, the "Hawaii Project" employees reported back to management at times that some customers desired to leave and terminate their relationship with IW due to the customers' dissatisfaction with IW. Wagner 30(b)(6) Depo., at 59:24-60:15, Ex. 5.

53.     Michael Skedeleski testified that Smart Source did not solicit his company to cease doing business with IW and that "[t]he decision to stop working with Innerworkings was [the company's] decision based upon [their] own experience with Innerworkings." *See* Ex. 1.

54.     Similarly, Dino Corpuz testified that Smart Source did not solicit his company to cease doing business with IW, that IW's service had been declining, and that the decision to stop working with IW was his company's decision based upon their own experience with IW. *See* Ex. 2.

55.     Jocelyn Apo also testified that that that Smart Source did not solicit her company to cease doing business with IW, that IW's service and overall support had been declining, and that the company was dissatisfied with the relationship and decided to stop sending new purchase orders to IW. *See* Ex. 3.

**IW – And Thereafter HH Global – Continued To Generate Revenue From Hawaii-Based Customers Through And Including 2022**

56.     ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████. Innerworkings, Inc., Form 8-K (October 1, 2020), attached as **Ex. 30**; INWK 013869, attached as **Ex. 31**.

57.     Kristian Elgey, HH Global's Group Chief Financial Officer, testified that the alleged loss of IW's Hawaii segment of its middle market business was in no way a factor in the acquisition. Deposition of Kristian Elgey ("Elgey Depo."), dated

December 9, 2022, at 107:12-15 (Q: "Did the alleged loss of the Hawaii segment of Innerworkings' business - - was that in any way a factor in the merger that we've discussed?" A: "Absolutely not."), attached as **Ex. 32**.

58.     Despite IW alleging that Smart Source destroyed IW Hawaii operations, as of 2021, HH Global had in fact retained 32 of approximately 170 of IW's Hawaii-based customers, which equates to approximately 19% of IW's Hawaii-based customers. DE 76, at ¶¶ 181, 203; Wagner 30(b)(6) Depo., at 220:12-221:4, Ex. 5.

59.     ███████████████████████████████████████████████
███████████████████████. INWK 013946, Ex. 14.

**IW Commences Litigation**

60.     IW filed its Complaint against Smart Source and Horn on April 15, 2021, more than six months after it was acquired by HH Global. DE 1.

61.      In its Complaint, IW sought different types of damages including, but not limited to, lost profits, actual damages, consequential damages, and exemplary damages. *Id.*

62.     On September 17, 2021, IW served its Fed. R. Civ. P. 26(A)(1) Initial Disclosures and claimed that "as discovery is ongoing, its damages are not reasonably calculable at this time." IW's Sept. 17, 2021 Fed. R. Civ. P. 26(A)(1) Initial Disclosures,  attached as **Ex. 33**.

63.     On February 18, 2022, IW filed its Amended Complaint in which it continued to repeatedly allege that it was entitled to lost profits. *See, e.g.*, DE 76 ¶¶ 140, 146, 155, 164, 172, 186, 198, 218.

64.     IW then served its Fed. R. Civ. P. 26(A)(1) Amended Initial Disclosures on September 7, 2022 and again claimed that "as discovery is ongoing, its damages are not reasonably calculable at this time." IW's Sept. 7, 2022 Fed. R. Civ. P. 26(A)(1) Amended Initial Disclosures, attached as **Ex. 34**.

65.     On November 21, 2022, IW served Amended Interrogatory Responses relating, in part, to its alleged damages and claimed that for each and every specific claim in the Amended Complaint, the damages were based on "the value of its business in Hawaii as February 14, 2020," the date that IW contends that Smart Source and Horn destroyed its business.   *See generally*, IW's Amended Interrogatory Responses Nos. 2-8, attached as **Ex. 35**.

66.     IW also served its Second Amended Initial Disclosures on November 21, 2022 confirming those alleged damages. *See* IW's Second Amended Rule 26 Disclosures, dated November 21, 2022, attached as **Ex. 36**.

67.     IW expressly disclaimed any claim for lost profits. *See* DE 145 at 10 n.5 ("Innerworkings is not seeking lost profit damages . . . .  It is seeking the value of the Hawaii business on the date it was destroyed by Defendants.").

**IW Description of the "Hawaii Business" is Fictional and Created Solely and Conveniently for this Litigation**

68.     IW's alleged "Hawaii business" was merely one of many locations where IW situated a group of middle market sales and customer service representatives — the term "Hawaii business" and/or "Hawaii operations" is a term created for this litigation. *See* DE 76, at ¶ 37.

69. 

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Henry 30(b)(6) Depo., at 67:13-19, Ex.

13. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮.” *Id.* at 40:13-41:4.

70. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at 42:16-44:4.

71.     IW's business that came from Hawaii was a very small percentage of its overall business in comparison to the company's overall total revenue. Wagner 30(b)(6) Depo., at 176:19-178:12 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) (emphasis added), Ex. 5.

## LEGAL STANDARD

"Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The purpose of summary judgment is ". . . to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, (1986). One of the primary purposes of summary judgment is to isolate and dispose of factually unsupported claims and defenses. *Celotex*, 477 U.S. at 323-24. Summary judgment is "properly regarded not as a disfavored procedural short cut, but rather as

an integral part of the federal rules as a whole." *Id.* at 327.

While inferences from the evidence must be drawn in favor of IW, it "may not rest upon mere allegations or denials," but "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (citing *First Nat. Bank of Ariz. v. Cities Service Co.*, 391 U.S. 25 (1968)).  The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.  *Chapman v. A1 Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000).

## ARGUMENT

I. **The Court Should Grant Summary Judgment Because IW Only Developed Evidence To Support An Inapplicable Damages Model Which It Inappropriately Attempts to Apply To All Of Its Different Claims**

The Court should grant summary judgment against IW because it has no evidence to establish the damages applicable to each of the claims asserted.  *See, e.g.*, *A&E Adventures LLC v. Intercard, Inc.*, 529 F. Supp. 3d 1333 (S.D. Fla. Mar. 26, 2021) (granting summary judgment where plaintiff failed to present evidence of recoverable damages for the claims pled).

As discussed, IW has elected to proceed solely on a "total destruction" damages model.  IW has frequently cited *KMS Rest. Corp. v. Wendy's Int'l Inc.*, 194 Fed. Appx. 591 (11th Cir. 2006) as the basis for its damage theory.  In *KMS*, the court explained that:

> It is well-established in Florida law that: [i]f a business is completely destroyed, the proper total measure of damages is the market value of the business on the date of the loss. If the business is not completely

destroyed, then it may recover lost profits. A business may not recover both lost profits and the market value of the business.

*Id.* at 601.  The KMS court rejected the use of market value in that case because the business was not completely destroyed, and explained that therefore "lost profits was the correct measure of damages." *Id.* at 601-02.

IW's "total destruction" damages model is inapplicable to the facts of this case because, like the business in *KMS* case, IW's business was not destroyed. Even if destruction of IW's business in one state, Hawaii, satisfied the *KMS* standard, IW's argument still fails because that business was not totally destroyed as of February 14, 2020, or any other date.  Further, if the Hawaii-based business were destroyed (which it was not), Hawaii, not Florida law, would govern, and Hawaii does not recognize the "total destruction" model.

### A.    IW's Business Was Not Totally Destroyed.

The Court can summarily dispose of this entire "total destruction" damage theory because IW's business was not totally destroyed. At the time of the alleged conduct, IW was a Delaware Corporation with its principal place of business in Chicago, Illinois and described its business as "global" marketing supply-chain company.  DE 76, at ¶¶ 22, 25 (emphasis added). IW continued to operate after February 14, 2020, and sold to HH Global for the total consideration amount of ███

████████████████████████████████████████████████████████████████

█████████.  *See* SOF ¶ 56.  Prior to this lawsuit (and apparently IW realization that it could not prove lost profits), there was literally no such thing as "Innerworkings'

Hawaii business." IW never treated its operations in Hawaii as a separate division, financial reporting unit, or separate entity. SOF ¶¶ 68-71.

IW now attempts to extend the "total destruction" damage model to a global company who experienced diminished sales in a single state. The Court should reject the argument because it is wholly untenable.

For example, in *Blueskygreenland Environmental Solutions, LLC v. 21st Century Planet Fund, LLC*, 2014 WL 3667874 (S.D. Fla. July 22, 2014), the court addressed the application of a "total destruction" damage model and explained:

> Although this principle has been mentioned in dicta by the Eleventh Circuit in a tortious interference case, *KMS Restaurant Corp. v. Wendy's Intern., Inc.*, 194 Fed. Appx. 591 (11th Cir. 2006), in that case the court found that the trial court properly rejected a jury instruction on the issue, finding the rule inapplicable in a case where the "business" was not completely destroyed. It noted that the alleged business interference did not result in a complete destruction of the 27 restaurants which were the subject of the interference claims, but rather the plaintiffs loss of the use of those restaurants as a Wendy's franchise. Because the plaintiff's business continued to exist, sans use of the restaurants, the court found that lost profits were recoverable as a proper element of damages.

*Id*. at *2. The court then the rejected the use of that damage model, explaining that "even if the rule is generally assumed applicable to a tortious interference claim, the alleged tortious interference did not result in complete destruction of the Rentar Indian distributorship which is the subject of the plaintiff's interference claims here, but rather, it allegedly caused the loss of plaintiff's right to participate as a distributor in the Indian market." *Id*.

Similarly, in *Zinn v. GJPS Lukas, Inc.*, 695 So. 2d 499 (Fla. 5th DCA 1997), there was a dispute regarding whether a business was totally destroyed. In that case, the

plaintiffs raised brined shrimp and sold tropical fish for resale, and the defendants contaminated the plaintiffs' outdoor ponds with pesticides. The pesticides prevented plaintiffs from raising shrimp outdoors, though they could still raise some in a covered shed. *Id*. at 500. The trial court concluded that the business was completely destroyed, and therefore plaintiffs were required to prove the market value of the business, which they failed to do. The appellate court reversed, finding "that while the [plaintiffs'] business was greatly diminished, it was not destroyed." *Id*. [2]

Likewise, here, Defendants' alleged conduct, as admitted by IW in the evidence in this record, simply did not result in the complete destruction of IW's business; IW continued to operate globally, and only its operations in one specific geographic area were allegedly affected. SOF ¶¶ 56-59,68-71. But as a global company, IW was still able to operate in Hawaii and divert resources or sales personnel as needed to service customers in that market (which it did), and in the time period after February 14, 2019, generated ███████████████████████████.[3]

IW was not totally destroyed, and therefore, as in *KMS*, lost profits would be the appropriate measure of damages. IW disclaimed lost profits [DE 145 at 10 n.5],

---

[2] *In re Sherwood Investments Overseas Ltd, Inc. ABN AMRO Bank N.V.*, No: 6:15-cv-1469, 2016 WL 5719450 (M.D. Fla. Sept. 30, 2016), the court did find that value of the business was the proper measure of damages, not lost profits because the company ceased operations. *See id*. at *9 ("Where the business at issue is completely destroyed—i.e., ***the business has ceased operations***—'the proper total measure of damages is the market value of the business on the date of the loss, not lost profits.'") (emphasis added; citation omitted). Innerworkings did not cease any operations.

[3] Innerworkings reported gross revenue for the Hawaii-related business of ███████████ ██████ in 2020, 2021, and 2022, respectively. *See* Ex. 14.

and has no evidence to establish such damages.   Accordingly, summary judgment is proper.

**B.    Even Assuming That "Total Destruction" Of A Portion Of A Business Was Sufficient, IW's Hawaii Business Was Not Totally Destroyed On February 14, 2020 Or Any Other Date**

Even assuming that the Court extends the "total destruction" damage model to a global company's loss of some of its sales employees who service a specific state, the Court should still grant summary judgment because IW cannot prove that its Hawaii business was totally destroyed on February 14, 2020 or any other date.   IW contends that "[t]he only valuation that is relevant here is that of Innerworkings on *February 14, 2020*, the date that Innerworkings Hawaii sales *representatives and customers departed for Smart Source*, and the destruction of its Hawaii business was complete." DE 141 at 10-11 (emphasis in original).

IW does not have any evidence that any customer, let alone all of its customers, departed for Smart Source on February 14, 2020. Rather, the record evidence is undisputed that customers were still placing orders immediately after February 14, 2020. ████████████████████████████████████████████████████ ████████ *See* Ex. 29 (" ██████████████████████████████████ ████████████████████████ ").  IW's own sales records confirm that its Hawaii business continued to operate and generate revenue until it was acquired by HH Global.  SOF ¶¶ 45, 56-59. IW even admitted that as of 2021, it had retained 32 of its approximately 170 Hawaii-based customers, which equates to approximately 19% of its customers. *Id.* ¶ 58.

Moreover, not all of the sales employees had left by February 14, 2020.   In January, 2023, after selecting its February 14, 2020 damage date, IW produced documents which showed ███████████████████████████████████████████ ████████████████████████████████████████ (Ex. 14), ████████████████ ████████████████████████████████████. *See* Ex. 15.[4] ██████████████ ████████████████████████████████████████████████████████ ████████████████████████████████. *See* Ex. 20.[5]

Viewed in the light most favorable to IW, the undisputed evidence establishes that as of February 14, 2020, IW (1) had not lost all of its Hawaii sales representatives or Hawaii customers and (2) continued to generate revenue until HH Global purchased IW in or around October 1, 2020.  Based on those facts, awarding damages in the amount of $5,570,000, which purportedly reflects the total fair market value of IW's assets as of February 14, 2020, as IW requests, would provide an impermissible and unproven damages windfall because IW continued to generate income from its

---

███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████ *See* Ex. 15.

[5] Innerworkings undoubtedly knows that calculating damages as of February 14, 2020 as opposed to February 26, 2020, would materially affect the damages calculation for its total destruction theory. Innerworkings conceded that if the valuation date were after February 24, 2020, COVID-19 would have been a known or knowable event, which would factor into calculating market value for damages. *See* DE 141 n.2.  Because Innerworkings used February 14, 2020 as its valuation date, its expert, Jesse Ultz, intentionally did not account for the effects of COVID-19 in his valuation.  Smart Source is contemporaneously moving to strike Ultz because he provided his purported valuation on the incorrect date, as well as for several other reasons.

assets after February 14, 2020, and thereafter sold those assets at fair market value in a public transaction.

IW cannot be permitted to obtain the fair market value of all of its assets (which it later sold), and then continue to use those same assets to generate income. IW, however, has no evidence to establish any other damage calculation from which the Court or jury could award damages, so summary judgment is proper and required. *See*, *e.g.*, *In re Oldham*, No. 21-605632022, 2022 WL 2804685, at * 6 (S.D. Fla. May 17, 2022) (concluding that proposed damage model "would result in a major windfall" and granting summary judgment because plaintiff "failed to establish [damages] with a reasonable degree of certainty").

### C. If IW Had A Hawaii Business That Was Destroyed, Hawaii Law Would Govern, Which Does Not Recognize The Total Destruction Theory

Florida applies the most significant relationship test, delineated in § 145 of the Restatement (Second) of Conflict of Laws, to determine the appropriate choice of law to be applied to all tort claims in this action. *Grupo Televisa, S.A. v. Telemundo Communications Group, Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007). Section 145 of the Restatement (Second) of Conflict of Laws provides:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.
>
> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

"The state where the injury occurred would, under most circumstances, be the decisive consideration in determining the applicable choice of law." *Chapman v. DePuy Orthopedics, Inc.*, 760 F. Supp. 2d 1310, 1313 (M.D. Fla. 2011) (quotations omitted).

To the extent, IW had a Hawaii business (it did not), Hawaii law would govern the claim given the place of the injury and other relevant factors.[6] *KMS*, which is premised on Florida law, would therefore be inapplicable, and Hawaii does not have a comparable law that the permits recovery of the fair market value of a business.[7] Thus, to the extent IW succeeds on its theory that it had a Hawaii business, it has still selected the wrong damage model and summary judgment is proper.[8]

---

[6] Because Innerworkings does not have a Hawaii business, Innerworkings' injury would be sustained in Illinois, its principal place of business, or Delaware, its state of incorporation. As set forth below in connection with the unfair competition claim, *see* Argument II(F), *infra*, application of the relevant choice of law factors results in application of Florida law. For the majority of the other claims, discussed below, the choice of law analysis is irrelevant to the arguments presented in this Motion because they are premised on defects that would be applicable under either law.

[7] Florida has a Standard Jury Instructions for Contract and Business Cases which includes a pattern instruction for the total destruction of business under the damages section. See § 504.4. Hawaii does not have any such instruction.

[8] In its Second Amended Initial Disclosures, IW stated that in addition to seeking the value of its business in Hawaii as of February 14, 2020, it would present factual testimony that it has historically paid four to six times EBIDTA to acquire business in the printing and promotional products industry. Ex. 36. IW contends that applying that same multiple to IW's 2019 EDIBTA would equate to $4,177,595.63 to $6,266,273.45. The Court could not award damages based on IW's proposed model because there is no evidence that how IW, or anyone else, valued specific businesses in the past accurately reflects how anyone would value of IW in 2020. Attempting to prove damages based on past transactions involving different companies would be entirely speculative and improper. *See, e.g., A&E Adventures*, 529 F. Supp. 3d at 1345 ("While the plaintiff need not calculate these damages with 'mathematical precision,' he may not advance a damages case that's based only on 'speculation or guesswork.'").

## II.   Separately, The Court Should Grant Summary Judgment Because IW Cannot Establish The Required Elements Of The Claims Pled

Separately, the Court should grant summary judgment on the specific claims pled based on dispositive defects, as set forth below.

### A.   The Court Should Grant Summary Judgment On Both Federal And State Claims Alleging Violations of Trade Secrets Acts

IW has alleged two (2) claims against Defendants for alleged violations of: (1) the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*; and (2) the Hawai'i Uniform Trade Secrets Act ("HUTSA"), HRS § 482B-1 *et seq. See* DE 76, Counts I and II. In order to bring a claim under the DTSA, a plaintiff "must plausibly allege that it 'possessed information of independent economic value' that (a) 'was lawfully owned by' the plaintiff and (b) for which the plaintiff 'took reasonable measures to keep secret,' and (ii) the defendant 'used and/or disclosed that information,' despite (iii) 'a duty to maintain its secrecy.'" *Trinity Graphic, USA, Inc. v. Tervis Tumbler Co.*, 320 F. Supp. 3d 1285, 1293 (M.D. Fla. 2018). To prevail on a claim under HUTSA, "a plaintiff must establish that there exists a trade secret and a misappropriation of that trade secret." *WHIC LLC v. NextGen Lab'ys, Inc.*, 341 F. Supp. 3d 1147, 1162 (D. Haw. 2018).

### 1. IW Cannot Prove that Horn and Smart Source Used and/or Misappropriated IW's Alleged Trade Secrets

IW's fatal flaw to each of these claims is the failure to prove that either of the Defendants actually used and/or misappropriated and/or disclosed any information which would constitute a trade secret.  The entirety of IW's claim was based upon

speculation. *See* DE76, ¶¶ 121, 132 (alleging that "there is a substantial likelihood that Horn has disclosed or used and will continue to use InnerWorkings's trade secrets."). IW now has no admissible evidence to substantiate its previous speculation, as is now required to withstand summary judgment. *See Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318F. 3d 1284, 1293-94 (11th Cir. 2003) (interpreting the Georgia Trade Secrets Act and holding that the lack of direct evidence and mere circumstantial evidence cannot prove that a trade secret was disclosed and/or used).

Simply put, there is no issue of fact here because IW has no evidence that either Horn or Smart Source used, disclosed, or misappropriated any of IW's alleged trade secrets. *See Admor HVAC Prods., Inc. v. Lessary*, No. 19-00068, 2019 WL 2518105, at *10 (D. Haw. June 18, 2019) (finding that plaintiff failed to meet its burden under the Defendant Trade Secrets Act because it did not establish that defendant misappropriated the database and nothing in the record suggested that defendant acquired or disclosed anything from the database).

The burden of proof is on IW, and IW cannot meet this burden at the time of summary adjudication based upon assumptions and speculation.

### 2. IW Cannot Prove Damages

Pursuant to the DTSA, "court[s] may award ... damages for actual loss caused by the misappropriation of the trade secret." *Balearia Caribbean Ltd., Corp. v. Calvo*, No. 16-23300-CIV, 2017 WL 8780944, at *4 (S.D. Fla. Aug. 3, 2017). Moreover, the DTSA provides that "if the trade secret is willfully and maliciously misappropriated, [the Court may] award exemplary damages . . . ." *TB Food USA, LLC v. Am.*

*Mariculture, Inc.*, No. 2:17-cv-9-FtM-29NPM, 2022 WL 3028061, at *17 (M.D. Fla. Aug. 1, 2022). HUTSA provides for similar relief. *See* HRS § 482B-4.

IW has no such testimony, and further cannot show a single email or document, to support what alleged specific trade secrets were used or misappropriated. Further, there is simply no evidence that any alleged use or misappropriation of IW's alleged trade secrets is the actual cause of injury to IW from which the jury or the Court could reasonably calculate any damage to IW, let alone a total destruction of IW's Hawaii business. Counts I and II therefore fail as a matter of law. *See, e.g., Joshua David Mellberg LLC v. Will*, No. 20-16215, 2021 WL 4480840, at *1 (9th Cir. Sept. 30, 2011) ("Summary judgment was appropriate on the trade secret claim because plaintiffs failed to establish defendants' conduct caused any damages.").

### B.   The Court Should Grant Summary Judgment On The Breach Of Contract Claims

IW asserts that Horn breached her alleged 2018 Stock Agreements by: (1) breaching the confidentiality covenants (Count III); (2) breaching the non-compete covenants (Count IV); (3) breaching the non-solicitation of customers covenants (Count V); and (4) breaching the non-solicitation of employees covenants (Count IV). It is undisputed that the 2018 Stock Agreements do not contain a wet-ink signature by Horn.  But, IW has no evidence that Horn accepted or otherwise executed the 2018 Stock Agreements electronically. Thus, IW is incapable of proving, among other things, that a valid and enforceable contract exists between Horn and IW.

### 1.   IW Cannot Establish Any Contract With Horn

The Federal Rules of Evidence govern the admissibility of evidence, including the admissibility of documents that are presented, signed, secured, archived and retrieved by an electronic signature process. The standard for the authentication of evidence under the Federal Rules of Evidence is contained in Rule 901, which provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Critical in the analysis of admissibility and the overall enforceability of documents executed using a given electronic signature process is the requirement of a secure method to archive and retrieve the documents so they cannot be altered after signature. *In re Vee Vinhnee*, 336 B.R. 437 (B.A.P. 9th Cir. 2005).

In addition to the method or process, there must be a credible person qualified to give testimony to the accuracy of the computer systems in the retention and retrieval of the information at issue. *Id.* The primary authenticity issue in the context of business records is on what has, or may have, happened to the record in the interval between when it was placed in the files and the time of trial. In other words, the record being proffered must be shown to continue to be an accurate representation of the record that originally was created. *Id.* IW cannot show (and the evidence in the record does not show) that the 2018 Stock Agreements are an accurate representation of the 2018 Stock Agreements as they are alleged to have existed when allegedly accepted by Horn.

In *In re Vee Vinhnee*, American Express produced computer records in order to prove the amount of its claims, along with a witness who testified about the computer system from which the records came from. *In re Vee Vinhnee*, 336 B.R. 437 at 448. Without any objection as to the admissibility of the computer records, the court, on its own, required American Express to provide the "authentication foundation regarding the computer and software in order to assure the continuing accuracy of the records." *Id.* at 442. Ultimately, the bankruptcy court refused to admit American Express' computer records into evidence because American Express failed to properly authenticate its computer records supporting the amount of its claims. *Id.* at 448.

On appeal, the Ninth Circuit Bankruptcy Appellate Panel affirmed the bankruptcy court's ruling. It held that proof that a document is an accurate representation of the document as it originally was created is a condition for satisfying the authentication requirement for admissibility. *In re Vee Vinhnee*, 336 B.R. 437 at 444. Citing Fed. R. Evid. 901(a), the court further noted that "authenticating a paperless electronic record, in principle, poses the same issue as for a paper record, the only difference being the format in which the record is maintained: one must demonstrate that the record that has been retrieved from the file, be it paper or electronic, is the same as the record that was originally placed into the file." *Id.* The court in *In re Vee Vinhnee* stated that "the focus is not on the circumstances of the creation of the record, but rather on the circumstances of the preservation of the record after its placement in a file, so as to assure that the document being proffered is the same as the document that originally was created." *Id.* IW simply cannot meet the foundation requirements

needed for admissibility and further cannot fix any such admissibility foundation issues for either of the 2018 Stock Agreements which IW proffers in support of, and as the sole basis for, Counts III, IV, V and VI.

Janell Oudenhoven ("Oudenhoven"), a former Compensation and Benefits Analyst and subsequent Senior Compensation and Benefits Analyst at IW, confirmed that IW did not manage or store copies of the 2018 Stock Agreements; rather, IW tasked non-party UBS with the responsibility for storing and maintaining copies of any such agreements on behalf of IW – including the 2018 Stock Agreements:

> Q: After somebody signed it, either the restricted stock agreement or the equity agreement, what did IW, Innerworkings, you, the HR team, receive from UBS?
>
> A: Do you mean did I -- are you asking if I received something notifying me that somebody signed their agreement?
>
> Q: Correct.
>
> A: I didn't receive an email specifically, but in UBS there was on the back-end a, I don't know, something you could click specifically that listed every single agreement and award that had gone out. And it showed the number of people it went to. It showed who accepted, who is pending, and who declined. And you could click into every single one of those and see who did each thing.
>
> Q: So that -- and that was all maintained on UBS's platform. Correct? Not on Innerworkings?
>
> A: Yes.
>
> Q: Okay. So did they send you a copy of a signed equity agreement or restricted stock agreement?
>
> A: A signed -- did they send me a signed copy of an employee's?

Q:     Correct. You or anybody else at Innerworkings that you're aware of?

A:     No. Because I could go pull it at any time. I could go to anybody's profile and click on it and have a copy if I needed it for some reason.

Q:     Did Innerworkings make it a practice at all to go in and download and save and maintain copies of executed agreements?

A:     No, I don't believe so, because everything was stored on the UBS site. I don't know if they did anything in preparation of the acquisition to HHG and moving from public to private.

Oudenhoven Depo. 115:24 – 117:13, Ex. 9.

Q:.    So it was certainly not a routine part of your practice that after the expiration to exercise the award or to accept the award, it was not a practice of yours to go then in and download executed copies from every employee who accepted and save them somewhere? You just left them on UBS's portal. Right?

A:     They existed on UBS's portal, and if anybody asked for one or we needed it for audit purposes or any other point in time, I would download it and provide it.

*Id.* at 117:18 – 118:2.

IW did not maintain copies of the 2018 Stock Agreements. Rather, IW could log into the UBS back-end portal to retrieve copies of the 2018 Stock Agreements. IW, however, did not routinely retrieve copies of the 2018 Stock Agreements and IW does not have a single witness who can testify that IW did in fact download, maintain, and preserve Horn's 2018 Stock Agreements in the ordinary course of business such that

they could introduce those purported documents into evidence in this case.[9] IW outsourced the retention of the 2018 Stock Agreements to non-party UBS.

As to UBS, Markovsky was identified by IW as a witness with "knowledge as to InnerWorkings' grants of stock and Restricted Stock Units to Sara Horn; and the administration of InnerWorkings's equity grant programs in the United States." *See* Ex. 36. Moreover, UBS designated Markovsky as its corporate representative for deposition purposes.

Markovsky confirmed that documents produced by UBS, pursuant to subpoenas and labeled UBS0000001 – UBS0000190, make up the entirety of the documents in UBS' care, custody, control or possession which were responsive to the subpoenas. Markovsky 30(b)(6) Depo., at 34:11 – 37:24, Ex. 10. Noticeably missing from UBS' production, however, are copies of the 2018 Stock Agreements (the agreements attached as Exhibits A and B to IW's Amended Complaint). Markovsky confirmed the 2018 Stock Agreements were missing because UBS no longer maintains or preserves copies, testifying on behalf of UBS as follows:

> Q:   Okay. So just to clarify, …, UBS did not keep copies of the 2018 agreements executed -- or not executed, I'm sorry, accepted by Sara Horn because the machine was essentially just turned off, correct?

---

[9] Innerworkings identified Theodore "Ted" Schneider ("Schneider"), former Senior Director of Compensation and Benefits, as a witness with "knowledge as to Innerworkings' grants of stock and Restricted Stock Units to Sara Horn; and the administration of Innerworkings's equity grant programs in the United States." *See* IW's Second Amended Rule 26 Disclosures, dated November 21, 2022, Ex. 36.  Schneider confirmed Oudenhoven's testimony that Innerworkings relied entirely on UBS to store and maintain copies of the 2018 Stock Agreements. Deposition of Ted Schneider, at 45:14 – 46:3; 86:14 – 87:13; 88:6 – 10, attached as **Ex. 37**.

> A:    Correct. It was -- the site was disabled, access was removed. It's just -- it's not there.
>
> Q:    So it's as if it just doesn't exist anymore on your end?
>
> A:    It doesn't exist on my end, correct.

Markovsky 30(b)(6) Depo., at 90:3-12, Ex. 10.

> Q:    So as of June 1, '21, the system shut off, Innerworkings no longer had access, UBS no longer had access to those records and that data anymore either, correct?
>
> A:    Correct. That's when we would have requested it to be shut off. Correct. It's not automated.

*Id.* at 136:13-18.

Markovsky further testified that UBS does not have copies or proof of what Horn saw at the time she allegedly accepted the 2018 Stock Agreements:

> Q:    So everything that you keep referring to is a representative of some sort of a screen that may or may not have been what Sara actually saw, but to confirm, what you keep referring to is not what Sara Horn actually saw, correct?
>
> A:    Correct.

*Id.* at 146:10-15.

> Q:    Okay. So you no longer have a copy or records relating to Sara Horn's user profile or user account, right?
>
> A:    Correct. We don't have that track or details anymore.

*Id.* at 151:11-15; *see also id.* at 157:18-20 (Q: "Okay. And you have testified that UBS does not have a copy of the '18 agreements, correct?" A: "Correct.").

Markovsky, testifying in her individual capacity, further discussed the 2018 Stock Agreements, this time being shown copies of the 2018 Stock Agreements. And

once again, Markovsky confirmed that UBS does not maintain copies, testifying as follows:

> Q:    … Exhibit 6[10] and Exhibit 7[11] are documents that appear to relate to the year of 2018, but what you testified earlier was that UBS has no record about the agreements accepted by Ms. Horn in 2018, correct?
>
> A:    Correct.  It's not able to retrieve it now. Correct. We don't have a record of it right now.
>
> Q:    And Exhibit 6 and Exhibit 7 as they appear, correct me if I'm wrong, UBS did not produce either copies of Exhibit 6 or Exhibit 7 in response to either subpoena issued by Ms. [Horn's] counsel or by Smart Source's counsel, correct?
>
> A:    Yes. Yes. Correct.

Markovsky Individual Depo., at 45:22 – 46:11, Ex. 10.

The court acts as gatekeeper on the preliminary questions regarding the admissibility of evidence. Fed. R. Evid. 104. The admissibility of evidence is a preliminary question for the court to resolve without being bound by the rules of evidence other than privilege rules. Fed. R. Evid. 104(a). As a result of the fact that neither IW nor UBS can authenticate either of the 2018 Stock Agreements, the Court must find that IW is incapable of authenticating 2018 Stock Agreements, and such alleged 2018 Stock Agreements, attached as Exhibit A and Exhibit B to the Amended Complaint (DE 76) are inadmissible as a matter of law.

---

[10]    The document identified as Exhibit 6 for deposition purposes is a copy of Exhibit A attached to IW's Amended Complaint.

[11]    The document identified as Exhibit 7 for deposition purposes is a copy of Exhibit B attached to IW's Amended Complaint.

Thus, IW cannot establish that it had any binding contract with Horn, which is an essential element of its four breach of contract claims. The Court should therefore grant summary judgment in favor of Horn on the Counts III-VI. *PNC Bank N.A. v. Laupco, Inc.*, 2014 WL 12685857, at *2 (M.D. Fla. July 18, 2014) ("Failure to show sufficient evidence of any essential element is fatal to the claim and the Court should grant the summary judgment."); (citing *Celotex*, 477 U.S. at 322-23) ("the plain language of Rule 56(c) mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.").

### 2. IW Cannot Prove Any Breach Caused Total Destruction

Assuming, without in any way admitting, the Court finds that IW may be able to authenticate the 2018 Stock Agreements sufficient enough to allow the arguments to be presented to the jury (which it cannot), IW has failed to provide any evidence that any of the separately alleged breaches by Horn in fact caused specific damages to IW's business. Counts III, IV, V and VI of the Amended Complaint are stand-alone claims for breach by Horn. Even if the Court were to find each alleged breach occurred,

that does not negate IW's obligation to prove that each stand-alone breach independently caused specific damages.

Assuming the Court finds Horn breached any or all of the covenants as alleged, IW has presented absolutely no evidence to support a theory that any of those breaches by Horn has, or even could, result in a total destruction of IW's business. There is no evidence that Horn solicited each individual employee or that any employee left IW as a result of Horn's solicitation. IW deposed a limited few employees and disregarded others.  IW cannot obtain damages if it cannot present evidence to establish that Horn solicited specific employees, which caused them to leave IW.

Similarly, there is no evidence Horn improperly solicited all (or any) of the IW's customers. IW has not deposed a single customer and has produced no affidavits from any customer to support a claim that all customers left IW as a result of Horn's solicitation. The undisputed evidence is that customers chose to leave IW. *See* Exs. 1-3.  Moreover, there is no evidence that Horn ever contacted any customers. There is also no evidence as to what confidential information Horn used or disclosed after her relationship with IW terminated. *See* Argument II(A)(1), *supra*. Further, there is no evidence that any violation of a non-compete covenant by Horn resulted in a total destruction of IW business.

Therefore, even if the Court allows the 2018 Stock Agreements into evidence, and if the Court finds Horn did in fact breach the 2018 Stock Agreements, each of IW's claims of breach fail as a matter of law because there is no evidence of causation from which the Court or jury can calculate damages for any specific breach.

## C.     The Court Should Grant Summary Judgment on the Aiding and Abetting a Breach of the Duty of Loyalty Claim

IW has alleged a claim against Defendants for allegedly aiding and abetting Evans in breaching his fiduciary duty of loyalty.  *See* DE 76, Count VII.  Assuming for purposes of this Motion that Evans had such a duty and breached it, the Court should grant summary judgment in favor of Defendants because IW does not have evidence that the alleged breaches caused IW any damages or to support any amount of damages for that claim.

In *Eckard Brandes, Inc. v. Riley*, 338 F.3d 1082 (9th Cir. 2003), the court held that an employer could bring a claim against an employee for breach of duty loyalty under Hawaii law and explained that "[a]lthough an employee 'is entitled to make arrangements to compete' with his employer prior to terminating the employment relationship, the employee is not 'entitled to solicit customers for such rival business before the end of his employment.'"  *Id.* at 1085 (citing Restatement (Second) of Agency § 393).  The court in that case found that two employees who set up a business to compete with their employer, and actually competed while employed, breached their duty of loyalty and ordered those employees to disgorge the profits they received. *Id.* at 1085-86.

Similarly, here, the mere fact that Evans may have been planning his exit from IW is not actionable.  *Eckard*, 338 F.3d at 1086 ("Merely preparing to compete does not itself breach the duty of loyalty.").  IW must prove that Evans breached his duty of loyalty and did business on behalf of Smart Source while employed by IW (which

is disputed), but assuming IW could prove that fact, the remedy would be to award, if proven in the record, the lost profits that Defendants allegedly obtained from Evans' breach and/or to disgorge Evans' profits.  IW, however, has no evidence from which the Court or the jury could compute or award such damages, and, of course, IW has expressly disclaimed any lost profit damages.  Accordingly, IW cannot establish any damages, an essential element of its claim.[12]

### D.  The Court Should Grant Summary Judgment On The Tortious Interference With Existing And Prospective Business Relationships Claims

IW asserted a claim against Smart Source for tortious interference with IW's prospective customers and its employees.  *See* DE 76, Count VII.  To establish a tortious interference claim, IW must prove: "(1) the existence of a business relationship, not necessarily evidenced by an enforceable contract; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship."  *Martin Petroleum Corp. v. Amerada Hess Corp.*, 769 So. 2d 1105, 1107 (Fla. 4th DCA 2000); *see generally Meridian Mortg., Inc. v. First Hawaiian Bank*, 122 P. 3d 1133 (Haw. Ct. App. 2005) (applying similar standards).

---

[12] Customers who previously worked with Evans at IW testified that their company was still willing to work with IW after Evans left.  *See* SOF ¶¶ 53-55.  Damages cannot be awarded for such customers on a breach of duty of loyalty claim because they were not solicited during Evans employment.

### 1.   IW cannot present evidence that Defendants caused any damage to IW

IW does not have any evidence from any customer regarding their alleged decision to cease working with IW.  That absence of evidence is fatal to the tortious interference claim.

*Westgate Resorts, Ltd. v. Sussman*, 2019 WL 3848805 (M.D. Fla. July 26, 2019) is instructive.  In that case, the plaintiff, a timeshare company, filed a lawsuit alleging that the defendant tortiously interfered with contracts between the plaintiff and its owners.  Plaintiff argued that it could prove its tortious interference claim by presenting a small sample of testimony from timeshare owners, but the court rejected that because plaintiff would have to show that the alleged tortious interference is what proximately caused the damages.  The court explained:

> What answers the question of what did owners do as a result of [defendant's] interference is, quite simply, testimony from owners (as the Court said at the Pre-Trial Conference). Alternatively, the Court was willing to entertain the possibility that statistical evidence could bridge this gap—which is why the Court asked the parties for briefing. That's out (Doc. 244), so the only remaining possibility is hearing from the owners. In no circumstances will the Court allow a case to proceed to a jury trial when it hangs on such loose evidentiary threads that Plaintiffs submit here. Plaintiffs' contentions that [defendant's] actions and words suffice to establish the outstanding causation and damages issues are rejected.

*Id.* at *2.  The court held that plaintiff could not proceed to trial on any claims related to owners who did not provide direct testimony.

Similarly, IW has no evidence to establish that the Defendants' purported attempts to interfere with IW's alleged clients actually caused IW damages because

they do not have any evidence from the actual clients as to why they ceased doing business with IW.  On the contrary, Smart Source, who has no burden to disprove Plaintiff's claims during summary judgment, nonetheless has evidence that customers ceased doing business with IW because they were dissatisfied with IW.  *See* Exs. 1-3.  Like in *Westgate*, the court cannot simply assume that all of IW's clients left IW because of Defendants' conduct.

That result is even more obvious here because it is undisputed that all of IW's business was on an order to order basis and that IW continued to engage in sales in Hawaii and generate revenue after its Hawaii business was allegedly destroyed in February of 2020.  *See* SOF ¶¶ 45-51.  Accordingly, IW had the capacity and ability to retain customers, (which it did as a matter of fact), so evidence of why the other customers did not remain is critical to establish that Defendants proximately caused IW's alleged damages.  IW does not have any such evidence, so the Court should grant summary judgment as Judge Dalton did in *Westgate*.

### 2. The tortious interference claim fails because IW cannot identify any relationship that was interfered with

The tortious interference with business relationship claim fails because IW has not identified any specific business relationships that were interfered with.  *See Sarkis v. Pafford Oil Co., Inc.*, 697 So. 2d 524, 526-27 (Fla. 1st DCA 1997) (citing *Ferguson Transportation Inc. v. North American Van Lines,* 687 So. 2d 821 (Fla. 1996) ("a claim of tortious interference with a business relationship requires proof that the plaintiff had a business relationship with 'identifiable customers'")).  A claim for tortious interference

will not stand if supported by evidence that a defendant interfered with a relationship between the plaintiff and the public at large.  *Sarkis,* 697 So. 2d at 527 (citing *Ferguson Transportation Inc.*, 687 So. 2d at 821)).

IW does not adduce to this record any evidence that Defendants interfered with any specific, identifiable customers with whom IW had a business relationship. Critically, sales in IW's middle market Hawaii business were one off transactions, and IW has no evidence to establish that it had ongoing relationships with any specific customers.  Indeed, IW conceded that customers could work with Smart Source and IW at the same time.  SOF ¶ 4.  IW may have hoped that customers would return, but IW elected not to seek discovery from any customer, and that absence of evidence is fatal to its claim.

### E.   The Court Should Grant Summary Judgment On The Tortious Interference With Contract Claim

IW asserted a claim against Smart Source for tortious interference with Horn's alleged contract with IW.  "Tortious interference with a contract and tortious interference with a business relationship are basically the same cause of action. The only material difference appears to be that in one there is a contract and in the other there is only a business relationship."  *Cent. States, Se. & Sw. v. Florida Soc. of Pathologists*, 824 So. 2d 935, 940 (Fla. 5th DCA 2002); *see generally Meridian Mortg., Inc. v. First Hawaiian Bank*, 122 P. 3d 1133 (Haw. Ct. App. 2005) (applying similar standards).

IW cannot satisfy any of the four elements of its claim.

### 1.    IW cannot prove any contract with Horn.

As discussed in Argument II(B)(1), *supra*, IW cannot prove that it had an enforceable contract with Horn.   Accordingly, any claim for interfering with that contract must fail.

### 2.    IW cannot prove that Smart Source knew of, or intentionally interfered with, any contract with Horn.

Even if IW is able to prove that it had some form of a contract with Horn, IW has no evidence that Smart Source knew of that contract or its terms or intentionally interfered with that contract.   The evidence is undisputed that when Horn left Smart Source, she requested multiple times, but was not given, a copy of any employment agreements.   SOF ¶¶ 22-24 .   Moreover, Smart Source testified that it was not aware that Horn was subject to any contractual prohibitions.   *Id*.   Accordingly, Smart Source could not have intentionally interfered with Horn's employment agreement, to the extent it exists.   *See, e.g*, *Martin Petroleum*, 769 So. 2d at 1107 (affirming summary judgment on tortious interference claim, noting that defendant "had no knowledge of the terms of the contract between Martin and Bamco.").

Moreover, the mere fact that Horn may not have breached her contract if Smart Source did not offer her employment is not sufficient to establish tortious interference. In *Martin Petroleum*, the court explained that merely making an offer to someone, even with knowledge that it may lead to a breach, does not constitute tortious interference. *Id*. at  1107.   There are no facts in this case that Smart Source did anything other than offer a fair compensation package to Horn to work for Smart Source as COO.

### 3. IW cannot prove damages.

To the extent Smart Source did tortiously interfere with Horn's contract, that did not, and could not, cause a total destruction of IW. As set forth in Argument II(B)(2), *supra*, there is no evidence that Horn solicited any IW's customer, so at a minimum, certain damages would not be attributable to Horn breaching her employment contract.

### F. The Court Should Grant Summary Judgment On The Unfair Competition Claim

1. <u>Florida Law</u>

IW improperly brings a claim for unfair competition against Smart Source and Horn under a Hawaii statute. there is no basis for this Court to apply a Hawaii statute to the facts of this case, so the claim must fail as a matter of law.

As discussed in Argument I(C), *supra*, the relevant factors to consider in a choice of law analysis are: (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered. None of these factors favor Hawaii.

IW is incorporated in Delaware and its principal place of business is Illinois, so to the extent it was injured by Defendants' alleged conduct, the injury would have been sustained in one of those states, not Hawaii. The alleged conduct occurred predominantly in Florida, as both Horn and Smart Source are located in Florida. *Blue-*

*Grace Logistics LLC v. Fahey*, No. 8:21-cv-2523-KKM-MRM, 2023 WL 424285, at \*7
(M.D. Fla. Jan. 26, 2023) ("[T]he place where the conduct occurred assumes particular
importance in torts involving unfair competition.") (quotations omitted).  None of the
relevant factors favor Hawaii.

There is no basis to apply Hawaii law to the facts of this case, so Count X must
fail as a matter of law.

2. Hawaii Law

If the Court determines Hawaii law applies, IW's claim also fails under Hawaii
law.  To recover upon a claim for violation of unfair method of competition, Plaintiff
must prove: (1) a violation of Hawaii Statutes Chapter 480; (2) an injury to the
plaintiff's business or property that flows from the defendant's conduct that negatively
affects competition or harms fair competition; and (3) proof of damages. *Field, Tr. Of
Est. of Aloha Sports Inc. v. Nat'l Collegiate Athletic Ass'n*, 431 P.3d 735, 745 (Haw. 2018)
(citing G*urrobat v. HTH Corp.*, 323 P.3d 792, 812 (Haw. 2014)). The second element
has two parts.  *Id.*  First, a plaintiff is required to demonstrate "an injury in fact to his
or her 'business or property.'"  *Id.*  Second, a plaintiff is required to show the "nature
of the competition."  *Id.*  The latter is met by demonstrating how the defendant's
conduct negatively affects competition or harms fair competition. *Id.*

In *Gurrobat v. HTH Corp.*, 323 P.3d 792, 812 (Haw. 2014), the Hawaii Supreme
Court examined both the injury in fact and the nature of the competition requirements.
*Gurrobat* met the injury in fact requirement by alleging and offering evidence that he

did not receive his share of service charges due to him.  *Id.*  As to the nature of the competition, *Gurrobat* alleged and offered evidence that the hotel's "practice of withholding a portion of the service charge without disclosure to customers allowed them to charge lower base prices than law-compliant competitors, thereby reducing 'fair competition' in the market for hotels, restaurants, and banquet service providers." *Id.*  The Hawaii Supreme Court noted that the noncompliance allowed the hotels to lower their overall prices thereby obtaining an "unfair and illegal business advantage" over compliant competitors thereby demonstrating that the noncompliant hotel's conduct could have negatively affected competition.  *Id.* at 813.

IW has alleged one (1) injury – complete destruction of IW's Hawaii business. It is undisputed that IW continued to operate globally, including in Hawaii.  If the Court finds IW did not suffer complete destruction of its business, the Court must rule that IW cannot meet its burden of showing an injury in fact sufficient to proceed to a jury.

As to the nature of competition, IW alleges Smart Source negatively affected competition because "Smart Source was able to enter InnerWorkings's market in Hawaii . . . without having to pay or invest fair value . . . ."  DE 76, at ¶ 205.  IW, however, fails to acknowledge that Smart Source was already competing in the market – the middle market as a whole, including Hawaii.  SOF ¶ 6.  Moreover, IW alleges it is not fair if Smart Source does not invest like its competitors.  IW, however, cites no legal requirement, monetary or otherwise, for competing in or entering the market.

And IW produced no evidence of IW's or other competitor's investment to enter or participate in the market.

The "market" has no barrier to entry and IW has no evidence of any particular requirement to "enter" or otherwise participate in the market.   Any person or company is free to solicit prospective customer business in the market.   So long as the person or company can fulfill the order then they can participate in the market.

Moreover, there is no evidence that IW protected itself in a manner that would have even created a barrier to entry for Smart Source or any other competitor.   IW could have had agreements, containing proper restrictive covenants, with each of its employees.   Unfortunately for IW, they did not.   And while they seemingly attempted to secure such agreements, as explained above at least with regard to Horn, they failed to do so – the result being that IW has no such enforceable agreements.   IW's general claims of "unfairness" aside, the simple fact that Smart Source was able to grow within the Hawaii market (where it already operated) in a way that was different from how IW grew does not constitute unfair competition.

Further, IW has presented no evidence that Smart Source "stole" or "improperly" hired any of IW's former employees.   Each such employee was an at-will employee: a commissioned sales representative under no employment contract for any term.   Smart Source was free to hire any or all of them absent evidence of a lawful restriction to the contrary – and IW has produced no such evidence.   Employees in various industries often leave one employer to join a competitor.   Absent a legal restriction by contract law, there is nothing unfair about a company hiring its

competitor's former employees.  Moreover, employees often leave their employer when they are unhappy.  And IW's employees at that time were unhappy - saying things like, for example, "… ███████████████████." *See* Ex. 26.

IW also alleges Smart Source negatively affected competition in the market by not investing approx. $5 million to enter the market, like its competitors have allegedly had to do, resulting in Smart Source creating customer incentives because Smart Source's competitors had higher costs to compete for the same business. *See* DE 76, at ¶ 207.  Again, Smart Source had already been competing in the market – the middle market as a whole, including Hawaii. SOF ¶ 6.  Moreover, the cost to compete is an impact upon a company's overall profitability.  It is not, however, by itself, a customer incentive or benefit.  The only way a lower cost to compete results in a benefit or incentive to a customer is when a customer is offered a lower price such that the company is effectively sharing a portion of its profits with its customers by way of a pass-through price reduction.  The market, as explained above, consists of customers purchasing on an order-by-order basis as needed from commissioned sales representatives only, with no fixed contract or term.  IW has produced absolutely no documents, no testimony or any other evidence that Smart Source offered price reductions or any other customer incentives to induce a single customer to work with Smart Source rather than a competitor in the market.

Expansion through simple hiring rather than acquisition is a profitability factor on a company's balance sheet.  A company's profitability does not benefit customers unless the company shares its profits in the form of lower pricing or the like. Without

evidence that Smart Source offered incentives to induce customers to utilize Smart Source over IW or other competitors in the market, IW's claim is nothing more than IW being unhappy that Smart Source may be a more profitable market competitor, and it therefore fails as a matter of law.

### G.     The Court Should Grant Summary Judgment On The Conspiracy (Count XI)

IW's conspiracy claim alleges that Horn and Smart Source conspired with Evans to steal employees, which breached Evans duty of loyalty.  DE 76, ¶¶ 213-214. It is unclear how the claim differs from the aiding and abetting breach of fiduciary duty claim (Count VII), but the claim fails based on IW's inability to prove damages for the same reason as Count VII.  *See* Argument II(C), *supra*.

Separately, Horn and Smart Source cannot conspire with each other as a matter of law.   The intracorporate conspiracy doctrine "forecloses an 'actionable conspiracy between an entity and its officers or agents.'" *Weisman v. Southern Wine & Spirits of Am., Inc.*, 297 So. 3d 646, 652 (Fla. 4th DCA 2020) (citing *Hoon v. Pate Constr. Co.*, 607 So. 2d 423, 430 (Fla. 4th DCA 1992)). "Where corporate agents are acting within the scope of their employment, their actions 'are attributed to the corporation itself, thereby negating the multiplicity of actions needed for a conspiracy.'" *Id.* (citation omitted). In other words, because the corporate agent is working on the corporation's behalf, there are not "two or more parties" as required to state a civil conspiracy claim.

IW's claims are premised on actions taken by Horn and Smart Source, while Horn was employed by Smart Source. The intracorporate conspiracy doctrine "forecloses" this alleged conspiracy.

WHEREFORE, Defendants respectfully request that this Court: (i) enter an order granting summary judgment in their favor on all claims asserted in the Amended Complaint; (ii) enter a final judgment in favor of Defendants; and (iii) grant such  other and further relief that this Court deems just and proper.

Respectfully submitted,

| | |
|---|---|
| */s/ Jennifer W. Corinis* | */s/ Eric Christu* |
| Jennifer W. Corinis | Louis Levenson |
| Florida Bar No. 49095 | (Admitted Pro Hac Vice) |
| **GREENBERG TRAURIG** | **LEVENSON & ASSOCIATES** |
| 101 E. Kennedy Blvd., Suite 1900 | 125 Broad Street SW |
| Tampa, FL  33602 | Atlanta, GA 30303 |
| corinisj@gtlaw.com | louis@levensonlaw.com |
| | |
| Daniel Hildebrand, Esquire | Eric C. Christu, Esq. |
| (Admitted Pro Hac Vice) | Florida Bar No. 434647 |
| LEWITAS HYMAN PC | SHUTTS & BOWEN LLP |
| 161 N. Clark Street, Suite 1600 | 525 Okeechobee Blvd., Suite 1100 |
| Chicago, IL  60601 | West Palm Beach, FL 33401 |
| dhildebrand@securitieslaw.com | echristu@shutts.com |
| | |
| Attorneys for Defendant Sara Horn | Attorneys for Defendant Smart Source, LLC |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 5, 2023, a true and correct copy of the foregoing was served electronically on all counsel of record.

*/s/  Eric C. Christu*
Eric C. Christu, Esq.